IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SANDRA L. DELANEY,                                    6:13-CV-01387-AC

        Plaintiff,                              FINDINGS AND
                                                      RECOMMENDATION

v.

CAROLYN W. COLVIN,
Commissioner, Social Security
Administration,

        Defendant.


ACOSTA, Magistrate Judge.

      Plaintiff Sandra Delaney seeks judicial review of a final decision of the Commissioner of

the Social Security Administration (SSA) in which she denied Plaintiff's applications for

Supplemental Security Income (SSI) under Title XVI and for  Disability Insurance Benefits

(DIB) under Title II of the Social Security Act. This court has jurisdiction to review the

1- FINDINGS AND RECOMMENDATION

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Following a review of the record, the court finds the decision of the Commissioner is supported by substantial evidence in the record and recommends the ALJ's decision be affirmed.

## ADMINISTRATIVE HISTORY

Plaintiff filed her applications for DIB and SSI on May 14, 2009, and alleged a disability onset date of February 1, 2006. Tr. 126-35.[1] The applications were denied initially and on reconsideration. An Administrative Law Judge (ALJ) held a hearing on February 8, 2012. Tr. 14-46. At the hearing Plaintiff was represented by an attorney. Plaintiff and a vocational expert (VE) testified.

The ALJ issued a decision on March 1, 2012, in which he found Plaintiff was not disabled. Tr. 57-66. That decision became the final decision of the Commissioner on June 7, 2013, when the Appeals Council denied Plaintiff's request for review. Tr. 1-4.

On August 8, 2013, Plaintiff filed a complaint in this court seeking review of the Commissioner's decision.

## BACKGROUND

Plaintiff was born in August, 1959, and was 52 years old at the time of the hearing. Tr. 126. She completed a General Equivalency Diploma. Tr. 173.

Plaintiff alleges disability due to "anxiety, sleep disorder, osteoarthritis, PTSD." Tr. 167.

---

[1] Citations to the official transcript of record filed by the Commissioner on January 30, 2012, are referred to as "Tr."

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue,* 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden, a claimant must demonstrate her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina,* 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.,* 574 F.3d 685, 690 (9th Cir. 2009)). It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine,* 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record.

3- FINDINGS AND RECOMMENDATION

*Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its

judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir.

2006).

## DISABILTY EVALUATION

At Step One the claimant is not disabled if the Commissioner determines the claimant is

engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I). *See also Keyser v. Comm'r*

*of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant

does not have any medically severe impairment or combination of impairments. 20 C.F.R. §

416.920(a)(4)(ii). *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's

impairments meet or equal one of the listed impairments that the Commissioner acknowledges

are so severe as to preclude substantial gainful activity. 20 C.F.R.

§ 416.920(a)(4)(iii). *See also Keyser*, 648 F.3d at 724. The criteria for the listed impairments,

known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed

Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual

functional capacity (RFC). The claimant's RFC is an assessment of the sustained, work-related

physical and mental activities the claimant can still do on a regular and continuing basis despite

his limitations. 20 C.F.R. § 416.920(e). *See also* Social Security Ruling (SSR) 96-8p. "A

'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."

SSR 96-8p, at *1. In other words, the Social Security Act does not require complete incapacity

4- FINDINGS AND RECOMMENDATION

to be disabled. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir.

2011)(citing *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant

retains the RFC to perform work she has done in the past.  20 C.F.R. § 416.920(a)(4)(iv).  *See*

*also Keyser,* 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able

to do any other work that exists in the national economy.  20 C.F.R. § 416.920(a)(4)(v).  *See also*

*Keyser*, 648 F.3d at 724-25.  Here the burden shifts to the Commissioner to show a significant

number of jobs exist in the national economy that the claimant can perform.  *Lockwood v.*

*Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010).  The Commissioner may satisfy

this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines

set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2.  If the Commissioner

meets this burden, the claimant is not disabled.  20 C.F.R. § 416.920(g)(1).

## ALJ'S FINDINGS

At Step One the ALJ found Plaintiff has not engaged

in substantial gainful activity since her February 1, 2006, onset date.  Tr. 59.

At Step Two the ALJ found Plaintiff has severe impairments of major depressive

disorder, obesity, hip pain, and neuropathy.  *Id.*

At Step Three the ALJ determined Plaintiff's impairments did not equal in severity a

listed impairment, and found Plaintiff retained the RFC to perform less than a full range of light

work.  The ALJ found Plaintiff can occasionally climb ramps and stairs; never climb ropes,

5- FINDINGS AND RECOMMENDATION

scaffolds, and ladders; frequently balance; occasionally stoop, kneel, crawl, and crouch. Finally, the ALJ determined Plaintiff is limited to simple, routine tasks with no public contact and only occasional interaction with coworkers. Tr. 61.

At Step Four, the ALJ found Plaintiff had no past relevant work. Tr. 65.

At Step Five, the ALJ found Plaintiff was capable of performing other work, including meter reader and postage machine operator. Tr. 66.

## THE MEDICAL EVIDENCE AND TESTIMONY

### I. The Medical Record

In April 2006 Plaintiff was advised she needed chemotherapy for breast cancer. Tr. 674-75. By June she was diagnosed with depression and anxiety. Tr. 415. Her doctor prescribed aprazalam. *Id.*

Plaintiff was seen at Umpqua Community Health Center ("UCHC") six times between August 1, 2006, and November 15, 2006, for depression, anxiety, and insomnia. Tr. 510-13, 173. She was tearful and distressed with severe joint and bone pain for which Oxycodone was prescribed.

In December 2006, Plaintiff was tearful and anxious with panic attacks, nightmares, and suicidal ideation. Tr. 508. On December 19, 2006, Plaintiff had left flank and abdomen pain and was diagnosed with a kidney stone. Tr. 353.

On January 7, 2007, Plaintiff reported left flank pain and was described as anxious and high strung. Tr. 507. On February 8, 2007, Plaintiff was vomiting and described as "very distraught/crying/worried," and was prescribed Lexapro and Serequol. Tr. 504. Her goals were to sleep, shower and walk daily. Plaintiff was described as "pressured" on February 14. Tr. 503.

6- FINDINGS AND RECOMMENDATION

Her mood was "better" on February 23, and she was sleeping better. Tr. 502. Her lumbar spine was tender to palpation.

On May 8, 2007, Plaintiff was anxious, crying, and diagnosed with neuropathy. Tr. 501. Cymbalta and Clonazapam were prescribed. On May 24 Plaintiff was described as sad and emotionally distraught. Tr. 500.

On June 26, 2007, Plaintiff presented as anxious, tearful, and "rattled greatly," though the Celexa was helping with the neuropathy. Tr. 499. One month later she was seen at Douglas County Mental Health and was "severely depressed," not sleeping, and described as "alert/forgetful/sad/distraught." Tr. 429. She stayed in bed, not caring for personal grooming or daily activities, and reported everything was a "struggle." *Id.* Her behavior was hypoactive, her affect was flat and labile, her mood anxious, angry and sad. *Id.* Her thinking was circumstantial and hopeless, and mental health specialist Ofelia Gentscheff, M.A., diagnosed Major Depressive Disorder, recurrent, moderate. Tr. 430. Plaintiff reported her father had been physically and mentally abusive, and she had had relationships with abusive men. Tr. 431. Ms. Gentscheff concluded Plaintiff had a long history of depression and anxiety exacerbated by a cancer diagnosis and chemotherapy. Tr. 434. Her prognosis was guarded.

In November, 2007, Edward Ottenheimer, III, M.D., an oncologist, diagnosed mild peripheral neuropathy related to Taxol. Tr. 281. In December, 2007, Plaintiff reported having a panic attack the prior week with shortness of breath, hyperventilating, and sweating. Tr. 497. In January 2008, Plaintiff had swelling in her hands, fingers, and feet. Dr. Ottenheimer diagnosed peripheral neuropathy secondary to chemotherapy. Tr. 278.

In March and April 2008, a chronic vitamin B12 deficiency was diagnosed. Cymbalta

7- FINDINGS AND RECOMMENDATION

was helping the neuropathy. Tr. 276-77.

On May 3, 2008, Plaintiff was brought to the emergency room by the police after threatening suicide. Tr. 346. She was angry, agitated, and combative. Tr. 346-47. The consulting psychiatrist, George W. Middlekauff, M.D., noted Plaintiff was confused about the date, had difficulty with serial subtraction, and found her insight and judgment were fair to poor. Tr. 350. Dr. Middlekauff diagnosed Major Depression, recurrent, with a history of alcohol abuse. Tr. 351. He assigned a GAF of 45.

On May 13, 2008, Plaintiff was described as anxious after learning her brother was dying. Tr. 490. On May 28 Plaintiff was anxious, with increased social anxiety, and burn marks on her forearms and feet were healing. Tr. 489. In June and July 2008 Plaintiff was stable and her mood better, but by August 6, 2008, she was anxious and crying. Tr. 486-88. On August 13, 2008, she had increased anxiety and was manic. Tr. 485. Dr. Ottenheimer noted mild chemo-induced neuropathy, myalgias, fatigue and hip pain. Tr. 274.

Plaintiff's radiation therapy was completed in November 2008. Tr. 679. She continued to have chronic fatigue through December. Tr. 272.

In February 2009 Plaintiff had arm, leg, and hip pain. Tr. 480. Her affect was flat. The next month Plaintiff reported she had increased anxiety and was afraid to go outside. Tr. 479. She had a flat affect, cried easily, and was agitated. *Id.* In April Plaintiff reported being afraid of many things, including going out alone, leaving the house, the bathroom, and people. Tr. 477. Her affect was flat, she was tearful, emotional, and frustrated, with suicidal ideation. She was advised to go to Douglas County Mental Health ("DCMH").

On April 15, 2009, Bill Conkey, M.A., L.M.F.T., completed a psychosocial assessment in

which Plaintiff reported a history of neglect and abuse. Tr. 412. Plaintiff said that when she is very anxious she sees things at the corners of her vision and hears voices. It was difficult to get groceries because she had a great deal of difficulty being around groups of people. She had lost her job as a barkeep when the bar closed, and had been unable to find work. Mr. Conkey diagnosed Major Depressive Disorder with psychotic features and General Anxiety Disorder, with a GAF of 55. Tr. 413. In late April Plaintiff had increased anxiety and fear, and was visibly agitated, wringing her hands and shaking her legs. Tr. 476. Plaintiff endorsed feeling nine of nine depression screening questions nearly every day. Tr. 516.

On May 5 Plaintiff's mood was improved, but on May 16, 2009 she was in the emergency room shaky and restless. Tr. 344. She had run out of Ativan two days earlier and was diagnosed with anxiety. On May 26 Plaintiff reported increased anxiety and insomnia. Tr. 474. Lorazepam was replaced with Zoloft.

On June 29, 2009, Plaintiff filed the applications at issue here.

On July 24, 2009, Daryl R. de Vore, A.C.S.W., reported Plaintiff was upset that her PCP had moved without telling her, she was unable to get her prescriptions filled, she had not slept for four days. Tr. 407. Mr. de Vore noted increased anxiety.

In August 2009 Nurse Jones noted acute grief and depression, and prescribed Rozerom for chronic leg pain. Tr. 468. Plaintiff reported she had not showered or taken her medications for two weeks, walking was painful, her memory was bad, and she had suicidal ideation and paranoia. Nurse Jones described her as distraught. On August 27 Nurse Jones diagnosed cellulitis and postconcussion syndrome arising from a fall two weeks prior, in which Plaintiff fell and struck her head while drinking

9- FINDINGS AND RECOMMENDATION

alcohol. Tr. 466. Nurse Jones called Mental Health for an emergency appointment for Plaintiff. On August 31 Plaintiff told Mr. de Vore that she was not sleeping and had increased anxiety. Tr. 403. Mr. de Vore diagnosed PTSD. In September Nurse Jones noted Plaintiff continued to have a headache though a CT scan of the head was within normal limits. Tr. 463.

On October 8, 2009, Nurse Jones reported Plaintiff was "hysterical, rocking in chair" and "in a full blown panic attack." Tr. 459-60. She could barely speak and was crying hysterically. Plaintiff was given 5 mg of Zyprexa and after 15 minutes she was still crying but could express herself. Plaintiff reported that she had not showered in a week because she was afraid of the shower, and that she can't go grocery shopping because there are "too many people." *Id.* Plaintiff reported her car blew up last week, and she didn't know what to do so she walked away. Nurse Jones prescribed Zyprexa.

On October 14 Plaintiff reported to DCMH she was having trouble remembering to take her medications, which were Abilify, Seroquel XR, Promethayine, Misoprostol, Sertraline, Hydrocodone, Clonazepam, Zyprexa, Prasosin, Diclofenac, Potassium, Diazepan and Loratadine. Tr. 395. She continued to have a headache, but was sleeping better. Plaintiff thought her medications were causing her to "space out." *Id.* The following week she attended group therapy, noting increased anxiety and panic. Tr. 394.

On November 10, 2009, Nurse Jones recorded "a lot of anxiety," and Plaintiff's reports that she was unable to leave the house and could not go to DCMH because her social worker was ill. Tr. 455. Her affect was flat.

In December 2009, Nurse Jones noted depression, anxiety, and acute grief reaction, as well as generalized osteoarthritis. Tr. 449. Plaintiff reported she has "been out walking with a

10- FINDINGS AND RECOMMENDATION

neighbor," and was "going to help a friend with catering." Tr. 450. She was not having

nightmares, but she "still has issues with the grocery store and shower," and complained of back

pain. *Id.*

On February 3, 2010, Plaintiff reported to Nurse Jones increased depression, insomnia,

fatigue, and anhedonia, as well as abdominal pain. Tr. 445. She was "smiling, joking." Tr. 446.

In February 2010 DCMH prepared a discharge summary, noting Plaintiff had not

contacted the clinic since September 2009. The diagnosis at discharge was Major Depressive

Disorder, recurrent, severe without psychotic features, and PTSD, with a GAF of 50. Tr. 389.

In March 2010 Nurse Jones increased Plaintiff's Seroquil. Tr. 438.

Anthony Glassman, M.D. performed an orthopedic examination of Plaintiff on June 2,

2010. Tr. 522-26. Plaintiff described hip pain from the hip joints, left greater than right, into the

buttock, exacerbated by walking, and subsiding after she rests about 15 minutes. Tr. 522. Dr.

Glassman noted left sided lower extremity atrophy. Plaintiff reported she could walk four

blocks. Dr. Glassman concluded Plaintiff could sit for six hours per day and stand and walk no

more than two hours per day and no longer than 30 minutes at a time. He thought her limited to

lifting 20 pounds occasionally, 10 pounds frequently and would need frequent rest breaks during

the day. Tr. 524. A late June x-ray of Plaintiff's hips showed a "very subtle osteoarthropathy" of

the left hip and the right hip was normal. Tr. 531.

In September 2010, Nurse Jones diagnosed a Vitamin D deficiency. Tr. 667. She noted

"lots of problems w/ her mood, anxiety is out of hand because of her teeth. She took all her

anxiety meds in two weeks last [month]." Tr. 597. Plaintiff reported tearfulness, moodiness,

insomnia, fatigue, anhedonia, and decreased motivation. *Id.* By September 30, Nurse Jones

recorded Plaintiff was back to being unable to go to the store or get in the shower. Tr. 591. She

cried "all the time." *Id.* Plaintiff complained of tearfulness, moodiness, insomnia, fatigue,

anhedonia, and decreased motivation. Nurse Jones noted Plaintiff was anxious, tearful, easily

distracted, and had a depressed affect. Tr. 593.

Plaintiff saw Scott Moore, P.A., on October 26, 2010, to follow up an urgent care visit

regarding a lump on her neck. Tr. 682. Plaintiff reported she stopped going to the mental health

clinic when her social worker became ill. She was "feeling better recently after starting new

medications." *Id.* Plaintiff reported she slept three hours a night, stating "I am pretty

isolated...bad anxiety and depression issues for which I have been hospitalized...can't get out

anymore...I am living by myself." Tr. 684. Plaintiff reported problems walking, washing and

dressing herself, performing her usual activities, and was extremely anxious and depressed. *Id.*

In early December, 2010, Nurse Jones noted increased depression and anxiety, and

prescribed Tramadol for increased "searing" leg pain. Tr. 585-86. Plaintiff had suicidal ideation,

and had been referred to mental health services but they did not accept the Oregon Health Plan so

she did not go. Tr. 586. Nurse Jones described Plaintiff as anxious, tearful, and easily distracted,

with a depressed affect. Tr. 588.

On January 6, 2011, Nurse Jones described Plaintiff as "improved," noting the Tramadol

reduced the shooting leg pain. Tr. 579. Plaintiff had a "better range of emotions this [office

visit]." Tr. 581.

On February 3, 2011, Nurse Jones noted complaints of fatigue and myalgias, and said the

risperdone was helping, though "she does not like going to the grocery store still but she had

been getting in the shower at least once a week now." Tr. 573. Her affect was flat and sleepy.

Tr. 576.

On March 22, 2011, Plaintiff was seen in the emergency room with tremors, headache, difficulty speaking, abnormal facial movements, and heart palpitations. Tr. 626. She was advised to discontinue Risperdal. Tr. 627.

On April 14, 2011, Theresa Lundy, M.D., noted Plaintiff had trouble being in public and would like to get off some of her medications. Tr. 566. Dr. Lundy noted rule out bipolar affective disorder. *Id.* Plaintiff reported pain at a level of 5/10. Dr. Lundy noted morbid obesity.

Plaintiff was seen in the emergency room on June 22, 2011, complaining of syncope and pain in her back, legs, knees, and ankles. Vicodin was prescribed. Tr. 617. June 28 x-rays of the left hip showed a "slight worsening of the mild left hip joint arthrosis." Tr. 647.

An August 11, 2011, MRI of Plaintiff's right neck mass showed "mild arthrosis of the rt sternoclavicular joint and subchondral cystic change and bone marrow edema which may be painful." Tr. 645.

On August 26 Plaintiff re-established care with Heidi Beery, M.D. Tr. 555. Dr. Beery noted sciatica and polyneuropathy due to medications. Plaintiff reported sharp shooting pains primarily in the left leg, and intermittent numbness. She limped frequently, and felt like her leg might snap off. Tr. 556. Walking was difficult due to pain. Tramadol did not help. Plaintiff reported she used to work in her garden, and got a job at a nursery but had to stop after one day because of pain. *Id.* She reported severe anxiety a few times a week, and was afraid of her shower for fear of falling. Plaintiff rated her pain as 8/10.

On August 30 Plaintiff reported pain of 8/10 to Dr. Beery. Tr. 554. On October 25, 2011, Plaintiff reported pain at 6/10. Tr. 715. Dr. Beery noted she had been "more active lately,

13- FINDINGS AND RECOMMENDATION

working out in her yard and babysitting her 1 ½ year old great niece. That has made her hips and knees sore and numb. Her feet have swollen by the end of the day. Is so stiff in the mornings that she can hardly walk." Tr. 714. Dr. Beery recorded normal lower extremity strength and decreased sensation not in an L5-S1 distribution. Tr. 716. Imaging of the lumbar spine showed advanced narrowing of the L5-S1 disc space with endplate sclerosis and ossteophyte formation. Tr. 718.

On November 28, 2011, there was electrophysiologic evidence of a symmetric sensory polyneuropathy. Tr. 697.

Dr. Beery noted on December 1, 2011, increased depression, and increased the prescription of Hydrocodoen-acetaminiphen. Tr. 709. Plaintiff had fallen and injured her right knee, her boyfriend was dying and she was not sleeping for fear he would be dead when she woke up. Tr. 710. Dr. Beery described her as depressed, hopeless, tearful, with anhedonia and loss of interest. Tr. 711. Her gait was normal. On December 12, 2011, Plaintiff received a cortisone injection for sacroiliitis. Tr. 707.

## II. Plaintiff's Testimony at February 8, 2012 Hearing

Plaintiff testified she has a hard time walking and she has to use a cane. Tr. 21. She said she fell down "a lot," and her mental condition "is not well at all." *Id.* The cane was not prescribed, she had acquired it six weeks before the hearing because it made walking easier.

Plaintiff was not seeing anyone for her mental health issues and stated the mental health system in Douglas County "is not very good." Tr. 21. Her dying partner moved out two months before the hearing because "I wasn't capable of taking care of him." Tr. 23, 35. Plaintiff stated she had a nervous breakdown 15 years ago, and a psychological evaluation resulted in a PTSD

14- FINDINGS AND RECOMMENDATION

diagnosis. Tr. 24. Plaintiff testified that she had not had a regular job for the past 15 years because "I couldn't keep them.... Because I was unable. I wasn't mentally able." *Id.*

Plaintiff testified that the aggressive chemotherapy and radiation she had in 2006 "destroyed my body. It destroyed my bones." Tr. 28.

Plaintiff testified she had worked retail and seasonally at a nursery. She had been a bartender. Her memory was not good, and she had been let go from a job as a packer with a fly tying company because she got confused, made a lot of mistakes, and missed 25 to 30 percent of her scheduled work shifts.

Plaintiff testified she continued to have side effects from chemotherapy. She stated her "legs would give out. My bones were weak. I fell down a lot. My head just was not right. I couldn't think." Tr. 29. Plaintiff said she was not stable on her feet and is anti-social. Tr. 30. She prefers to stay home. She has a hard time showering, and requires help to obtain groceries. Her mother and her friend help her shop. *Id.*

The leg pain and neuropathy has worsened since she stopped chemotherapy. "It feels like my leg is going to snap off when I walk." *Id.* She takes Hydrocodone and Tramadol for pain and Gabapentin for the neuropathy. Tr. 31. She sleeps with her legs propped up and can do dishes for five minutes before she has to put her legs up. The pain and numbness is worse on the left. She can walk about a hundred yards without a cane and about a block with a cane. Tr. 31-32.

The injection she had in her hip helped for about a week. Tr. 32. She has diabetic blisters on her feet, and her feet hurt all the time. She can stand for about ten minutes without her cane before she needs to lie down and put her feet up because of hip pain and her "hips give out." *Id.* She can sit for ten minutes before she has to lie down. Tr. 34. She has to pull herself up from a

15- FINDINGS AND RECOMMENDATION

seated position.  She does not cook or clean.  Plaintiff's friend does Plaintiff's laundry.  Tr. 38.

Plaintiff testified she cannot do laundry and she does not go out of her house.  She does not go to the grocery store because "I can't be around people.  I–it terrifies me.  I have anxiety attacks.  I just – I can't do it."  Tr. 39.

Plaintiff stated she used to be socially active, but became "a hermit in my house" when she got sick. *Id.* She doesn't want to be this way, but does not know how to change it. Tr. 40.  She stopped going to mental health counseling in 2010 because "I'm just a number there. I felt like I was falling between the cracks. They couldn't do one-on-one therapy, so they put me in a group, that was very uncomfortable to be around the people." *Id.* They changed her therapists several times, and she did not feel like the system was helping her.

Plaintiff stated she does not drive because she gets confused and nervous and has anxiety attacks.  She gets disoriented and lost and hasn't driven since she had chemotherapy.  Tr. 41.  She has a bad memory and does not read books because she can't retain the material. *Id.*

In 2007 and 2008 Plaintiff tried to work about twice a month at a friend's tavern but the tavern closed.  She was not physically able at that time to work full-time at the tavern.  In 2008 she worked at a plant nursery for one day but her hips and back gave out and she had to go to the hospital.  Tr. 42.

## DISCUSSION

Plaintiff contends the ALJ erred by (1) failing to find degenerative disc disease a severe impairment at Step Two;  (2) finding Plaintiff less than fully credible; (3) failing to articulate clear and convincing reasons for rejecting the opinion of Anthony Glassman, M.D.; (4) failing to credit lay testimony;  (5) failing to meet her burden of proof that Plaintiff retains the ability to perform

"other work" in the  national economy, and (6) failing to develop the record by ordering a consultative examination.

## I.  The ALJ Did Not Err at Step Two

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's ] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

Generally, failure to identify an impairment as "severe" at step two is harmless error because the ALJ continues the analysis and the question becomes whether the ALJ has properly included all functional limitations in the RFC.

Plaintiff contends the ALJ erred by failing to note a September 20, 2011, x-ray showing

advanced narrowing of the L5-S1 disc space with end plate sclerosis, osteophyte formation, and facet arthrosis showing L5-S1 degenerative change.  Tr. 714.  She argues the ALJ failed to note a December 2006 abdominal CT exam in which degenerate changes of the lumbar spine were noted. Tr. 356.  Plaintiff contends that the ALJ's failure to cite this evidence and failure to include advanced degenerative changes as a severe impairment at Step Two was error.  However, Plaintiff does not point to any functional limitations documented by this evidence.  The ALJ properly found Plaintiff had severe impairments at Step Two and continued the sequential evaluation, and therefore any error was harmless.

## II.  Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  *See also Vasquez v. Astrue,* 547 F.3d 1101, 1104 (9th Cir. 2008).  The ALJ's findings, however, must be supported by specific, cogent reasons.  *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998).  *See also Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001).  Unless there is affirmative evidence that shows the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.*  The ALJ must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. *Id.*  The evidence upon which the ALJ relies must be substantial. *Id.* at 724.  *See also Holohan,* 246 F.3d at 1208.  General findings (*e.g.*, "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick,* 157 F.3d at 722.  *See also Holohan,* 246 F.3d at 1208.  The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958

(9th Cir. 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis:  the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

> Under the *Cotton* test, a claimant who alleges disability
> based on subjective symptoms "must produce objective
> medical evidence of an under-lying impairment which
> could reasonably be expected to produce the pain or
> other symptoms alleged." *Bunnell*, 947 F.2d at 344 (quoting
> 42 U.S.C. § 423(d)(5)(A) (1988)); *Cotton*, 799 F.2d at
> 1407-08.  The *Cotton* test imposes only two requirements
> on the claimant:(l) she must produce objective medical
> evidence of an impairment or impairments; and (2) she must
> show that the impairment or combination of impairments
> *could reasonably be expected to* (not that it did in fact)
> produce some degree of symptom.

*Smolen*, 80 F.3d at 1282. *See also Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

The ALJ found Plaintiff's statements as to the severity of her impairments less than fully credible. Tr. 63. The ALJ cited Plaintiff's daily activities as inconsistent with her alleged limitations. Tr. 63. "She can shop, clean, vacuum, care for a pet, maintain her garden, care for an ill friend, babysit her grand-niece, and work part-time for other friends." *Id.* Plaintiff points to her testimony that she worked about twice a month for friends who owned a tavern, and that she could not have worked full time because being around people who drink makes her nervous. Tr. 41-42. Plaintiff notes the ALJ found Plaintiff earned $1998 in 2007 and $1811 in 2008 which, considering the applicable minimum wage at the time, worked out to about 4.5 to 5 hours per week of work. Tr. 59.

19- FINDINGS AND RECOMMENDATION

The Commissioner correctly notes that part-time work after an alleged onset date undermines credibility. *Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1227 (9th Cir. 2009).

Plaintiff cites her testimony that she worked one day at a nursery because it caused pain in her hips and back. Tr. 42-43. Plaintiff's October 2011 report of working in her yard and babysitting made her hips and knees sore and numb. Tr. 714. Regarding household cleaning, Plaintiff waits until the work "absolutely has to be done" and "sometimes it takes my friend or mom yelling at me to do it." Tr. 187. The ALJ properly noted that Plaintiff's part-time work, walking with a friend, and attempt to work at a nursery contradict her claim of fear of being in public. Tr. 63.

As to Plaintiff's care for an ill friend, she testified that she fed him and gave him medications for about a month, but she could not take care of him properly and he moved out. Tr. 36-37. On this record, Plaintiff's daily activities constitute a reason to find her less than fully credible.

The ALJ noted Plaintiff received mostly conservative treatment, stating "physical examinations have been normal." Tr. 63. Plaintiff points to Dr. Glassman's June 2010 diagnosis of neuropathy, confirmed by electrophysiologic evidence. Tr. 697. Plaintiff cites the x-ray indicating narrowing at L5-S1, and evidence of mild left hip joint arthrosis. Drs. Glassman and Schreiner found decreased sensation in the lower extremities. Tr. 523, 696, 701. Dr. Schreiner noted absent reflexes at the ankles. Tr. 701. These minimal findings are contradicted, as the ALJ noted, by February, August, and December 2011 examinations in which Plaintiff's gait and range of motion were normal. Tr. 64.

The Commissioner argues that Plaintiff's credibility as to her limitations is contradicted by her attendance at vocational training in 2008. Tr. 63, 276. Dr. Ottenheimer noted in April 2008 Plaintiff was "attending an Umpqua Training education course." Tr. 276. Dr. Middlekauff noted

20- FINDINGS AND RECOMMENDATION

that she reported she was "going through vocational rehab." Tr. 350.  On May 27, 2009, Plaintiff reported she was "accepted by Voc Rehab and waiting for testing." Tr. 410.  These statements suggest Plaintiff was not as limited as she alleged.

The Commissioner argues Plaintiff's credibility is undermined by activities reflected in a June 2009 note, that she helped "a friend who always helps her by taking the friends 2 children to Wildlife Safari and the fish ladder this past week." Tr. 416.  Defendant's Responsive Brief, at 9. However, the ALJ did not address this evidence and the Commissioner cannot rely upon it. Moreover, the report arises during a mental health counseling session in which her counselor stated "[p]rocessed her anxiety during those experiences with focus on coping skills...." Tr. 416.

The ALJ articulated clear and convincing reasons to find Plaintiff's symptom testimony less than fully credible.  The ALJ's credibility determination is supported by substantial evidence in the record and should be upheld.

## III.  The Medical Evidence

Disability opinions are reserved for the Commissioner.   20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).  If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician.  *Id.*  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart,* 454 F.3d 1063,

1067 (9th Cir. 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The opinion of an nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F.3d at 1066 n.2. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

On examination Dr. Glassman found, in June 2010, Plaintiff had bilateral hip pain "consistent with hip pathology. There are no imaging studies to either confirm or rule that out." Tr. 523. Plaintiff had lower extremity neuropathy, primarily sensory with light touch and position more affected than pinprick, and lateral femoral cutaneous neuropathy consistent with meralgia paresthetica, etiology uncertain. *Id.* Dr. Glassman stated that, from a work standpoint, Plaintiff could sit six hours per day and stand and walk no more than two hours per day and no longer than 30 minutes at a time. Tr. 524. He thought her limited to lifting 20 pounds occasionally, 10 pounds frequently, and she "would need frequent rest breaks during the day." *Id.*

The ALJ gave "some weight" to Dr. Glassman, but "the objective evidence described above does not support limiting the claimant to two hours of standing and walking." Tr. 64. The ALJ relied upon the June 2010 nonexamining opinion of Linda Jensen, M.D. Dr. Jensen's opinion conflicts with Dr. Glassman's opinion as to how long Plaintiff can stand per day. Tr. 534. The Commissioner notes Dr. Jensen reviewed Plaintiff's medical record, including Dr. Glassman's report, while Dr. Glassman reviewed no records. Tr. 533, 540. Dr. Jensen noted that a bone scan revealed no findings, but Dr. Glassman had no access to any imaging studies. Tr. 540, 523. Dr.

Jensen summarized Dr. Glassman's report as including "minimal findings," failing to identify any pathology or etiology, and showing only mild left leg neuropathy and "mild/subtle osteoarthopaty." Tr. 540.

The ALJ found Dr. Jensen's opinion consistent with other evidence in the record, noting that Plaintiff reported medication relieved the neuropathy. Tr. 63, 276. The ALJ cited 2010 x-rays showing "[e]quivocal early osteoarthritis," and subsequent x-rays showed "slight worsening of...mild left hip joint arthrosis." Tr. 64, 531-32, 647. The ALJ noted examinations in February, August, and December 2011 showed normal gait and range of motion. Tr. 64, 558, 575, 708.

On this record, the ALJ's rejection of the examining physician is supported by specific and legitimate reasons and supported by substantial evidence.

## IV. Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

Plaintiff's friend, Susan Elan, wrote that she had seen Plaintiff fall on several occasions. Tr. 259, 261. Ms. Elan goes to Plaintiff's home every other day to wash the dishes, do the laundry, and

23- FINDINGS AND RECOMMENDATION

help Plaintiff shower. Tr. 259. She does grocery shopping for her. Plaintiff no longer goes shopping with her because she has had several panic attacks while in public. *Id.*

The ALJ found Elan's statement credible "to the extent it is based on personal observations," but "the alleged limitations lack support in the objective medical record." Tr. 64. As set out above, the ALJ found Plaintiff not fully credible as to her symptoms. The ALJ noted that the medical record does not substantiate the frequency of falls. Tr. 64-65.

The ALJ's assessment of the lay testimony is supported by substantial evidence.

Plaintiff submitted additional lay evidence to the Appeals Council after the ALJ's decision. Tr. 263-67. The court considers this evidence because it is part of the administrative record even if not part of the record before the ALJ. *Brewes v. Comm'r.,* 682 F.3d 1157, 1163 (9th Cir. 2012), citing *Lingenfelter v. Astrue,* 504 F.3d 1028, 1030 n.2 (9th Cir. 2007)(when Appeals Council considers new evidence in denying a claimant's request for review, the reviewing court considers both the ALJ's decision and the additional evidence submitted to the Council).

Plaintiff's son, Blake Delaney, wrote that Plaintiff had extreme difficulty with most types of social situations and for the most part keeps to herself inside her home. Tr. 264. Julie Lewis wrote that Plaintiff's physical, emotional, and mental conditions had deteriorated since having breast cancer. Tr. 264. She had helped Plaintiff clean her house and taken her shopping, but Plaintiff did not get out of the vehicle because of anxiety. *Id.* She had sat in the bathroom while Plaintiff showered because Plaintiff could not breath due to panic attacks.

Plaintiff's mother, Ellen Street, wrote that Plaintiff gets confused at times, has severe anxiety attacks, and is antisocial. Tr. 266-67. She takes Plaintiff to the store, but Plaintiff leaves before the shopping is finished. Tr. 267. Ms. Street shops for Plaintiff, who "stresses out" over small things.

*Id.*

The lay testimony submitted to the Appeals Council does not undermine the evidence supporting the ALJ's decision. Evidence manufactured after the ALJ's decision is inherently less persuasive. *See, Macri v. Chater,* 93 F.3d 540, 544 (9th Cir. 1996)(*citing Weetman v. Sullivan,* 877 F.2d 20, 23 (9th Cir. 1989)). The lay testimony submitted to the Appeals Council is undermined by the medical evidence, the medical opinions, and Plaintiff's activities.

## V.  Step Five

Plaintiff argues the ALJ's Step Five determination was defective because it did not include Dr. Glassman's opinion that Plaintiff could stand and walk no more than two hours per day and no more than 30 minutes at a time. As set out above, the ALJ properly rejected Dr. Glassman's opinion.

Plaintiff contends the Step Five finding was defective because the VE was not asked to consider Plaintiff's testimony that she is limited to standing ten minutes before needing to put her feet up. As set out above, the ALJ properly determined Plaintiff was not fully credible as to her limitations.

## VI. Duty to Develop the Record

Plaintiff contends the ALJ erred by failing to order a psychological examination. Plaintiff's counsel requested an examination in July 2011.  Tr. 221.

The ALJ has an independent "'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Smolen,* 80 F.3d at 1288 (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)).  This duty extends to the represented as well as to the unrepresented claimant. *Id.* The ALJ's duty to develop the record fully is heightened where the claimant may be mentally ill and thus unable to protect her own interests. *Higbee v. Sullivan,* 974 F.2d 558, 562 (9th

Cir. 1992). Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry." *Smolen,* 80 F.3d at 1288; *Armstrong v. Commissioner of Soc. Sec. Admin.,* 160 F.3d 587, 590 (9th Cir. 1998).

The Commissioner argues the ALJ accommodated Plaintiff's mental impairments by limiting her to simple, routine tasks with no public contact and only occasional contact with coworkers, relying on the assessment of Dr. Nicoloff, the state agency psychologist who reviewed the record in August 2009, two and half years before the hearing.

The record before the ALJ was complete. It contained all of the evidence of Plaintiff's mental impairments from the relevant period. There is no allegation that additional records exist.

Plaintiff argues that after Dr. Nicoloff's assessment Plaintiff continued to have mental health limitations, pointing to the numerous times she reported increased symptoms. The Commissioner examines the same period of time and notes the numerous times Plaintiff reported or demonstrated an improvement in her symptoms. Where, as here, the ALJ's interpretation of the record may not be the only reasonable one, the ALJ's interpretation is reasonable, supported by substantial evidence, and should be affirmed. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009)(quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).

## RECOMMENDATION

For these reasons, the court should affirm the decision of the Commissioner and this matter should be dismissed.

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 7, 2015. If no objections are filed, review of the

Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 21, 2015, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this 23rd day of March, 2015.

John V. Acosta
United States Magistrate Judge

27- FINDINGS AND RECOMMENDATION